STEPHANIE JONAS, BARBARA STREAM, AND THE ELDER FAM-
ILY TRUST, PLAINTIFFS–APPELLANTS, v. PRUTAUB JOINT
VENTURE, A NEW JERSEY GENERAL PARTNERSHIP, DE-
FENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 8, 1989—Decided November 27, 1989.

Before Judges PRESSLER, LONG and LANDAU.

*George R. Hirsch* argued the cause for appellants (*Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime,* attorneys).

*Stephen D. Cuyler* argued the cause for respondent (*Cuyler, Burk & Matthews*, attorneys; *Ellen C. Williams*, on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

Plaintiffs Stephanie Jonas, Barbara Stream and The Elder Family Trust appeal from a summary judgment[1] dismissing their complaint against defendant Prutaub Joint Venture, a New Jersey general partnership, and the owner of the Short Hills Mall, a shopping center in Essex County in which plaintiffs, by their corporations and under a lease with Prutaub, conduct a retail business as a Scandia Down franchisee. The issue raised by this appeal is whether defendant committed a business tort against plaintiffs by refusing to consent to an assignment as defined by the lease. The trial judge concluded that as a matter of law, based on the undisputed facts of record, defendant acted within its contractual rights in refusing to accept the new store operator proffered by plaintiffs. We agree, although for somewhat different reasons.

Plaintiffs are the sole stockholders of E & R Land and Livestock Company, a Nevada corporation, which, as noted, is a franchisee of Scandia Down Corporation, a manufacturer and distributor of down comforters, pillows and related items. Scandia Down has a number of franchised retail operations throughout the country and many in other malls owned by defendant or its principals. In November 1984 E & R entered into a lease with Prutaub for a small shop in which it agreed to operate a Scandia Down retail franchise. The lease included an express prohibition of assignment or subletting, fixed the rent in substantial measure on the amount of E & R's gross sales, and provided that sale or transfer of a majority of the tenant's

---

[1]Although the motion was styled as one for judgment on the pleadings under *R.* 4:6–2(e), it was actually converted into a summary judgment motion under *R.* 4:46 by reason of the parties' reliance on certifications and affidavits. *See R.* 4:6–2 (last unnumbered sentence).

corporate stock would, in effect, constitute an assignment or sublet. Among the purposes of the assignment/sublet bar, as explained by the lease, is the following:

> Landlord has entered into this Lease with Tenant in order to obtain for the benefit of the entire regional retail development the unique attraction of Tenant's trade name set forth in Section 16.01 and the unique merchandising mix and product line associated with Tenant's business as described in Section 7.01, and the foregoing prohibition on assignment or subletting or the like is expressly agreed to by Tenant as an inducement to Landlord to Lease to Tenant.

Following its execution of the lease but before the date of actual occupancy, E & R, with the written consent of Prutaub, assigned the lease to its wholly owned subsidiary ESS–DEE, Inc., whose lease obligations it and plaintiff Stream guaranteed.

Two years later, plaintiffs entered into negotiations for the sale of the corporate stock of E & R to Franchise Systems (USA), Inc., a close corporation of which one Ibrahim K. Houri was president. The sale contemplated the turnover to Franchise Systems of the Short Hills Mall store as well as a Scandia Down shop operated by E & R in New York City. E & R and Franchise Systems ultimately entered into a contract for the sale of the stock for $750,000 contingent upon defendant's approval of assignment of the Short Hills Mall lease.

Included in the record on the motion is the correspondence between the parties' attorneys respecting plaintiffs' request for defendant's consent as well as explanatory affidavits. Defendant's initial letter denying plaintiffs' request for its consent relied first on the assignment/sublet prohibition of the lease, but also asserted the following:

> Irrespective of this absolute right to withhold consent, Prutaub believes there are legitimate reasons for refusing to approve the assignments at this time. In particular, the sales by the current tenant are extremely high, when compared to the sales level for other Scandia Down stores. The landlord believes that these high sales are likely caused by the special expertise and abilities of the existing ownership and management. In this regard, the landlord has not been provided with any information concerning the skill or experience of the proposed new ownership and management or any information which would indicate that new management would be in a position to continue the extremely high sales performance.

In this regard, a supporting affidavit by defendant's manager of lease administration asserts, without dispute or contradiction, that

> Scandia Down franchises are located in Taubman operated malls across the country. The gross sales per square foot of the store in Short Hills are greater than the gross sales per square foot of all other Scandia Down franchises in Taubman operated malls, and in some such cases are approximately four times greater.

Moreover, it appears that although Franchise Systems had been approved as a franchisee by Scandia, the person proposed by Franchise Systems as the manager of the Short Hills Mall store had yet to take the training course Scandia offered and had not had any similar retailing experience. She had been described by plaintiffs to defendant as "a college graduate with a degree in business, was employed for approximately five years as an administration assistant with A & P, and has been employed for approximately six years by Mr. Houri's company." Consequently, plaintiffs had agreed to provide Franchise Systems with consulting services in its initial operation of the store.

Defendant's refusal to accept Franchise Systems as its effective tenant in lieu of plaintiffs resulted in the cancellation of plaintiffs' contract with Franchise Systems. They accordingly commenced this action, claiming that the refusal was wrongful and seeking damages resulting from their loss of the transaction.

The critical issue, as plaintiffs view it, is whether, in a commercial lease which expressly prohibits assignment or sublease, the landlord is nevertheless obliged to consent to an assignment or sublease requested by the tenant which meets a standard of commercial reasonableness. Plaintiffs, relying on *Sommer v. Kridel,* 74 *N.J.* 446 (1977), urge that such a rule applies to residential leases and should now be extended by us to commercial leases despite the contrary holdings of our intermediate appellate courts prior to *Sommer. See, e.g., Brower v. Glen Wild Lake Co.,* 86 *N.J.Super.* 341, 346 (App. Div.1965), certif. den. 44 *N.J.* 399 (1965); *Zucker v. Dehm,* 128 *N.J.L.* 435 (Sup.Ct.1942); *Muller v. Beck,* 94 *N.J.L.* 311 (Sup.Ct.

1920). *And compare Ringwood Assocs., Ltd. v. Jack's of Route 23,* 153 *N.J.Super.* 294 (Law Div.1977), aff'd 166 *N.J.Super.* 36 (App.Div.1979), in which the court addressed the reasonableness of a commercial landlord's withholding of consent where the lease, however, expressly provided that "consent shall not be unreasonably withheld."

We are aware of the developing so-called minority view which, despite the nonassignability clause of a commercial lease, requires the landlord to consent to a commercially reasonable assignment request by the tenant. *See Kendall v. Ernest Pestana, Inc.,* 40 *Cal.*3d 488, 220 *Cal.Rptr.* 818, 709 *P.*2d 837 (Sup.Ct.1985); *Fernandez v. Vazquez,* 397 *So.*2d 1171 (Fla.Dist.Ct.App.1981). *And see* cases collected in Annot., *Withholding Consent—Assignment of Lease,* 21 *A.L.R.*4th 188 (1983), and supplemental case service. In our view, however, it is not necessary for us to address that issue since we are persuaded by the record on the motion that defendant's withholding of consent was reasonable on its face. Hence, even if a commercially reasonable rule were to obtain—a matter as to which we expressly decline comment—there is no factual issue presented whose resolution would undermine the reasonableness of the explanation defendant gave plaintiffs for refusing to consent. That is to say, because of the percentage lease, defendant was intimately affected by and legitimately concerned in the profitable operation of the demised premises—not merely to assure performance by the tenant of its lease obligations but because it shared directly in that profitability. Plaintiffs were asking defendant to give up, without any consideration, the operator of the most profitable of the Scandia Down shops located in all of its numerous shopping malls—a profitability it attributed to management's skill and experience—and to accept instead a management having no track record at all in this type of retail operation. We believe the commercial reasonableness of defendant's rejection of this obvi-

ously disadvantageous proposal is not open to question.[2]

We further note plaintiffs' contention that defendant's response of "make me an offer" when they requested consent to the assignment constituted some form of commercial extortion. We disagree. As we view the circumstances, plaintiffs were proposing a material change in their contractual arrangements which adversely affected defendant. It may be presumed that there might have been some type of consideration acceptable to defendant to compensate it for undertaking what was, at best, a business risk from which it had attempted to protect itself by the assignment bar of this lease. The point is that defendant was not acting unreasonably in suggesting that a material change in the lease had to be negotiated, not merely demanded.

Finally, we find no merit in plaintiffs' assertions that there were questions of fact as to estoppel, defendant's waiver or breach of lease, or ambiguity of lease. *R.* 2:11–3(e)(1)(E).

---

[2]We note that none of the so-called minority-view cases appears to involve a percentage lease. While we do not intend to foreclose the possibility that, as a matter of fact, an assignment in this situation might be commercially reasonable, we are nevertheless satisfied that this one was not.